332 P.3d 631

**Sandra C.J. BALOGH, Respondent/Plaintiff–Appellant,**

v.

**Donald Raymond BALOGH, Petitioner/Defendant–Appellee.**

No. SCWC–11–0001074.

Supreme Court of Hawai'i.

Aug. 11, 2014.

Rebecca A. Copeland for petitioner.

Stephen T. Hioki for respondent.

RECKTENWALD, C.J., NAKAYAMA, McKENNA, JJ., and Circuit Judge CHAN, in place of ACOBA, J., recused, with POLLACK, J., concurring and dissenting separately.

Opinion of the Court by
RECKTENWALD, C.J.

We consider whether various documents signed by a husband and wife should control the division and distribution of their marital partnership property upon divorce. Donald Raymond Balogh (Ray) and Sandra C.J. Balogh (Sandra)[1] married in New Jersey in 1981. After moving to Oahu in 2003, the couple began constructing a home on a vacant lot they had purchased (Kahalakua property or the property). The parties held title to the property as tenants by the entirety.

On October 6, 2008, following a period of tension between Ray and Sandra, they each signed a handwritten document stating that if they separated, Sandra would receive seventy-five percent of the profit from the sale of the property, the contents of their home (excluding Ray's tools and clothes), and all of their vehicles. A few weeks later, on October 24, 2008, the parties signed a typewritten Memorandum of Understanding (MOU) stating that upon separation or divorce, Sandra would receive seventy-five percent of the proceeds from the sale of the property, the contents of their home (excluding Ray's tools and building equipment), all of their vehicles, and $100,000 from Ray in lieu of alimony and court proceedings.

After a period of continued tension between Ray and Sandra, Ray agreed to move out of the couple's home on August 15, 2009. On September 1, 2009, Ray signed a quitclaim deed transferring his entire interest in the property to Sandra for ten dollars and "other valuable consideration."

In January 2010, Sandra filed a complaint for divorce in the Family Court of the First Circuit. Notwithstanding the quitclaim deed and two agreements, the family court awarded Ray and Sandra each a one-half interest

in the property, which it valued at $1.6 million at the time of divorce.[2] The family court concluded that it would be unconscionable to enforce the quitclaim deed and that all three agreements were unenforceable because Ray acted under duress and coercion when he signed them.

Sandra appealed, and the Intermediate Court of Appeals vacated in part the family court's divorce decree and its findings of fact and conclusions of law, and remanded for further proceedings. The ICA concluded that both the quitclaim deed and MOU were enforceable. The ICA explained that the quitclaim deed was not unconscionable and that Ray executed both the deed and the MOU voluntarily. The ICA also concluded that the deed superseded the MOU only to the extent it modified the disposition of the Kahalakua property, and therefore remanded to the family court to determine whether Ray owed Sandra an additional $100,000 pursuant to the MOU.

In his application, Ray presents two questions: (1) whether the ICA erred in vacating the family court's decision that the postmarital agreements and the quitclaim deed were unenforceable because they were unconscionable; and (2) whether the ICA erred in vacating the family court's decision that the postmarital agreements and quitclaim deed were unenforceable because they were entered into involuntarily.

As a threshold matter, we hold that the quitclaim deed does not constitute a separation agreement that alters the parties' rights to an equitable division of their marital partnership property, such that Sandra should receive the entire value of the Kahalakua property. The ICA therefore erred in concluding that the quitclaim deed was an enforceable separation agreement.

Because the quitclaim deed did not affect the disposition of the couple's marital partnership property upon divorce, we must also consider whether the MOU is enforceable. We hold that the MOU is enforceable because it is not unconscionable and was en-

---

1. Because both parties in this case share the same surname, we refer to them by their first names, i.e., Ray and Sandra.

2. The Honorable Paul T. Murakami presided.

tered into voluntarily. Because we conclude that the MOU is enforceable, we do not consider the October 6, 2008 handwritten agreement. The ICA's judgment is therefore vacated, the family court's divorce decree and findings of fact and conclusions of law are vacated in part, and we remand this case to the family court for further proceedings consistent with this opinion.

## I. Background

The following factual background is taken from the record on appeal and the family court's findings of fact and conclusions of law.[3]

### A. Factual background

Ray and Sandra married in 1981 in New Jersey. At the time of the marriage, Sandra owned two properties in Monmouth County, New Jersey. Sandra sold the first property in 1982 for $89,000. The second property was a vacant lot which Sandra had purchased for $28,750 (Wall Township property). At the time of the marriage, Ray owned one property which he sold shortly thereafter for $40,000. According to Ray, after he and Sandra married, they built a home on the Wall Township property.

Ray and Sandra are both well educated. Ray has a bachelor of science and a master's degree in electrical engineering. Sandra has a bachelor of science in biological science and a master's degree in education and student personal services. While living in New Jersey, Ray worked as a contractor for various companies. Before retiring in 2002, Sandra worked as a high school guidance counselor for more than twenty-five years.

While Ray and Sandra were living in New Jersey, they regularly vacationed in Hawai'i. In 2002, Ray and Sandra purchased the Kahalakua property, which was a vacant lot on O'ahu on Kahalakua Street, for $280,000. Ray and Sandra took out a home-equity loan on the Wall Township property to pay for the Kahalakua property. Ray and Sandra held title to the Kahalakua property as tenants by the entirety.

In 2003, Ray and Sandra decided to move to Hawai'i so that Sandra could care for her elderly parents. The couple sold the Wall Township property for $545,000.

Soon after arriving in Hawai'i, Ray and Sandra hired a contractor to build a home on the Kahalakua property for $595,000. The couple used the proceeds from the sale of the Wall Township property, as well as approximately $350,000 Ray had inherited and money from their joint savings, to help pay for the Kahalakua property and the construction of the home on the property.

Construction on the property began in 2004 and the home was supposed to be completed within two years. There were problems with the construction process from the start. The builder showed up only sporadically and eventually walked off the project without completing the work. In 2006, the builder placed a mechanic's lien on the property, even though there was a list of approximately 150 incomplete items.

The homeowner's association then sought to assess Ray and Sandra a penalty totaling $350,000 because the house had not been completed within the prescribed two-year period. The couple sued the homeowner's association, and the parties agreed on a reduced penalty of $5,000 with an additional two-year period to complete construction of the home.

In order to complete the home, Ray and Sandra paid a total of $60,000 to six additional subcontractors, but the home was still not completed. About six months after the original builder had walked off the job, Ray and Sandra were able to move into the house.

3. On appeal, Sandra challenged only two of the family court's factual findings. Specifically, Sandra challenged finding of fact 48 to the extent it stated that "Sandra told Ray he should leave," and finding of fact 53, which stated the following: "After discussions with Sandra, Ray thought the Quitclaim deed would protect the home from potential lawsuits, but title would be transferred back to joint ownership when thing[s] returned to normal." All of the family court's remaining findings of fact are binding on this court. *See Bremer v. Weeks*, 104 Hawai'i 43, 63, 85 P.3d 150, 170 (2004) ("[F]indings of fact that are not challenged on appeal are binding on the appellate court." (quotation marks, ellipsis, and citation omitted)).

During this time, Sandra was working as a part-time secretary, and Ray was working for Northrop Grumman. Sandra coordinated the work of most of the subcontractors, and Ray worked on the house when he was home from work. For example, Ray finished the kitchen.

Tension arose between Ray and Sandra after Ray began going outside their home without clothes on. Ray's behavior resulted in complaints from neighbors and a visit to the couple's home by the police. Sandra also suspected that Ray was having an affair because he had lost weight, was working out, and was well tanned. Sandra also observed Ray giving other women what she described as "lecherous looks."

Ray stopped working in July 2008, after his contract with Northrop Grumman had expired and he was unable to find additional work. At the time of his retirement, Ray was earning between $115,000 and $120,000 per year. Following his retirement, Ray continued to work on the house.

After months of arguing and still questioning Ray's fidelity, Sandra told Ray that if he was serious about being committed to the marriage, that they should "write something up." On October 6, 2008, Ray wrote an agreement, as dictated by Sandra, that provided the following:

> If Sandy and Ray Balogh are to separate from each other their assets are to be divided as such:
>
> I Donald Raymond Balogh agree that my wife Sandra C. Balogh will receive:
>
> 1. ¾ or 75% of the profits of the sale of [ ] Kahalakua St.
>
> 2. The entire contents of the house excluding Ray's tools and clothes
>
> 3. All vehicles at time of separation[.]

Both Ray and Sandra signed the agreement. Sandra was not thinking about divorce when she asked Ray to sign this agreement; instead, Sandra thought that Ray was committing to saving their marriage. Ray acknowledged that he had agreed to the terms of the agreement, and Sandra testified that she did not threaten Ray to get him to sign the agreement. According to Ray, he was not in his right mind when he signed the agreement, but nevertheless signed the agreement to show his good faith and commitment to save the marriage. Ray thought that if he did not sign the agreement, his and Sandra's relationship would further degrade and he would be thrown out of the house.

Sandra, however, remained suspicious of Ray's fidelity. Just over two weeks after they had signed the first agreement, Ray and Sandra executed the MOU in front of a notary. The MOU provided the following:

> This Agreement between Donald Balogh and Sandra Balogh will be implemented if they are to separate and/or divorce from each other.
>
> Their assets will be divided as follows:
>
> 1. In regards to the contents of the house at [ ] Kahalakua St., Honolulu, HI [ ]: Donald Balogh (Ray) will receive his tools and building equipment. Sandra Balogh (Sandy) will receive the entire contents of the house, furniture, appliances, electronics (televisions, etc.)
>
> 2. In regards to vehicles: Sandy will receive the vehicles.
>
> 3. In regards to the proceeds of the house, due to a sale: Sandy will receive 75% of the sale proceeds and Ray will receive 25% of the proceeds.
>
> 4. In regards to compensation: Ray agrees to pay $100,000.00 to Sandy in lieu of Alimony and court proceedings.

Again, both Ray and Sandra signed the agreement. Sandra testified that the MOU was intended as an inducement for Ray to work on the marriage because if Ray was "going to sign something like that, which gives [Sandra] quite a bit, then [Ray] must [have been] serious about working on the marriage." Sandra testified that she added the additional term requiring Ray to pay her $100,000 to obtain further commitment from Ray to their marriage and to "see how serious he was." Ray acknowledged that he agreed to the terms of the MOU, and Sandra testified that she did not threaten Ray before he signed the MOU. Because Ray signed the MOU, Sandra thought that Ray would tell her the truth and stop his inappropriate behavior. Ray signed the MOU in a "desperate attempt to hold the marriage together."

In November 2008, an attorney representing the homeowner's association mailed a letter to Ray and Sandra. The letter stated that a number of individuals had complained about Ray's behavior. In January 2009, a second letter was mailed to Ray and Sandra. This letter detailed another incident involving Ray and demanded that Ray cease and desist. Ray hid both of these letters from Sandra. Ray's behavior, however, did not stop.

In June 2009, Ray and Sandra were walking on the Makapuʻu Trail when police stopped Ray to question him about exposing his buttocks. The following month, Ray and Sandra were at Ala Moana shopping center when security officers again stopped the couple to question Ray about exposing his buttocks. Ray was issued a trespass warning, banning him from the shopping center for one year. Following both incidents, Ray told Sandra that he had not exposed himself.

Ray sent a written request to Ala Moana, asking that the one-year ban be lifted, but on August 10, 2009, that request was denied. Upon receiving the letter denying Ray's request, Sandra wanted to contact a lawyer because she believed Ray that he had done nothing wrong. Ray then admitted to exposing his buttocks at Ala Moana. Sandra was shocked. Ray agreed to move out of the couple's home the following day.

Ray testified that by that point, the marriage had "melted down," the anxiety and friction were constant, and there was "just so much tension in the house," that he "decided that it'd be best that [he] leave." Before Ray left, Sandra asked him to call their relatives to tell them what was happening. While Ray was speaking to his sister on the telephone, Sandra heard Ray mention the possibility of divorce and she got upset. Sandra then told Ray, "I need security, Ray, I need security, I need you to sign the house over to me." Ray agreed to do so, and Sandra said that she would make the necessary arrangements. Ray moved out of the couple's home on August 15, 2009.

On September 1, 2009, Ray and Sandra met to execute a quitclaim deed, in which Ray granted his interest in the Kahalakua property to Sandra in exchange for ten dollars and "other valuable consideration." According to Ray, he thought the deed was only a "temporary agreement," that would protect the home from potential lawsuits, and that title would eventually be transferred back to joint ownership. Ray testified that he signed the deed in an effort to save the marriage and that he signed the document "in a panic."

On September 24, 2009, Ray and Sandra met with Dr. Renee Robinson for marriage counseling. Dr. Robinson referred Ray to a specialist on obsessive-compulsive behavior. Ray saw the specialist three times, who recommended ways for Ray to deal with his behavior.

## B. Family court proceedings

Ray and Sandra attempted to execute an uncontested divorce, which failed because Ray refused to sign the divorce documents. On January 14, 2010, Sandra filed a Complaint for Divorce. Following a trial, the family court rendered an oral decision. As relevant here, the family court stated the following:

> The Court considered what it thought to be the appropriate motivations and reasonings of the parties. What was clear to the Court is that at the time the documents were done, both were focused—both husband and wife were focused on I think, in their own words, saving the marriage. That was the primary motivation for the documents. At some point those actions— what may have been intent became actions. A quitclaim was signed. But it is unclear as to what the motivations of both parties were, and that's why, again, you folks went to trial. Based on the relevant case law, the Court finds that this would be an inequitable provision to hold both parties to.

> Court's going to rule as follows:

> With regard to the marital property, which is the Kahala home, the Court is going to basically award Mr. Balogh a one half interest. That one half interest may be satisfied either by way of a sale of the property, in which case the net proceeds are cut in half, or Mrs. Balogh may buy out Mr. Balogh.

The Court's going to set the buy-out price—I'm sorry, the value of the property at 1.6 based on the relevant testimony. Again, the Court comes to that number based on what was presented in court. I know there's conflicting testimony, but that's the price the Court's going to—or the—the value the Court will set. Again, if it comes to an actual sale, it may be more, it may be less. For purposes of a buy-out, the Court will set it at 1.6. So basically it's 800,000, if it's a buy-out.

On December 2, 2011, the family court issued the divorce decree. The decree provided the following:

a. The Court finds that it is inequitable to enforce the agreements entered into by the parties on October 6, 2008, October 24, 2008, and September 1, 2009, as to the real property located at [ ] Kahalakua Street, Honolulu, Hawaii (marital residence).

b. he gross value of said property is $1,600,000.00.

c. Said property shall be sold in a commercially reasonable manner. From the proceeds of the sale, the realtor commissions, escrow fees, and costs of sale shall be paid. Thereafter, the net proceeds shall be divided equally between the parties.

d. Either party may buy-out the other party.

e. The foregoing provisions shall be enforced upon the expiration of 90 days from the effective date of this Decree.

f. The parties [are] to cooperate on resolving the mechanics lien.

On February 15, 2012, the family court issued its findings of fact and conclusions of law. As relevant here, the family court made the following conclusions of law:

K. To enforce the parties' agreement or the Quitclaim Deed is to award Sandra with a marital asset worth $1,600,000. In doing so, Sandra would be receiving more than 85% of the marital estate.

L. In addition, Ray contributed $350,000 of his inheritance and $40,000 of his premarital asset[s] to the marital partnership, for which he is not receiving a credit. Sandra contributed $89,000 of her premarital asset[s] to the marital partnership for which she is not receiving a credit.

M. If Ray received credit for his $390,000 capital contribution, Ray's share of the retirement/securities accounts would just be sufficient to repay him his capital contribution. He would in essence receive 0% of the marital estate if Sandra is awarded the Kahala Kua property.

N. After thirty years of marriage, the Court concludes it would be unconscionable to award Sandra the Kahala Kua property by enforcing the Quitclaim Deed. *Kuroda v. Kuroda*, 87 Hawai'i 419, 958 P.2d 541 (Haw.App.1998); and *Lewis v. Lewis*, 69 Haw. 497, 748 P.2d 1362 (1988).

O. Further, after considering their testimony, the Court finds that the parties were motivated to save the marriage when they signed the various agreements. When Ray signed the Quitclaim Deed, Ray was protecting their marital home from potential lawsuits and had no intent of permanently transferring his interest to Sandra. Neither party intended their marriage to result in a divorce and to divide their marital estate accordingly.

P. The Court finds Ray was suffering from extreme distress as a result of the ongoing construction of their Kahala Kua residence, the contractor's walk-off and lawsuit in 2006, the penalties assessed by the [homeowner's association] and parties' lawsuit against [the homeowner's association], his high security clearance job which also required twenty-four hour/seven days on call one week a month, the continuing issues with the subcontractors, and his uncontrollable obsessive behavior that escalated from his backyard nudity to public display, his shame and embarrassment, his fear of being discovered, and the constant argument with Sandra about his inappropriate behavior. At the same time, Sandra suspected him of infidelity which further exacerbated the marital relationship and escalated the tension and the friction in their home. Ray was thus under duress and coercion when he signed the agreements. *Prell v. Silverstein*, 114 Hawai'i 286, 162 P.3d 2 (Haw.App.2007).

Q. Therefore, the Court concludes that the parties' agreements on October 6, 2008, October 24, 2008, and September 1, 2009, are not enforceable.

R. Accordingly, each party shall be awarded fifty-percent (50%) interest in their Kahala Kua property. The parties may sell said property and divide the net sales proceeds equally or Sandra may buy-out Ray's interest for the amount of Eight Hundred Thousand and No/100 Dollars ($800,000.00). Said provision shall take place within 90 days of the effective date of the Divorce Decree.

## C. ICA proceedings and proceedings in this court

On December 20, 2011, Sandra timely filed a notice of appeal. In her amended opening brief—and as relevant here—Sandra argued that the agreements and the quitclaim deed were not unconscionable, Ray was not under duress when he signed each agreement and the deed, and in signing the three documents, Ray did not intend to protect the Kahalakua property from the claims of third parties. Sandra argued, therefore, that the agreements and the deed were enforceable.

The ICA agreed with Sandra that the family court erred with regard to the agreements' enforceability. The ICA first concluded that the quitclaim deed was not unconscionable. The ICA noted that "nothing in the record indicates unfair surprise," and that "this is not an exceptional case where the agreement was so one-sided that it is unconscionable even without a showing of unfair surprise." The ICA explained that "[t]he fact that [Ray's] (perhaps shortsighted) decision to quitclaim his interest to [Sandra] ultimately turned out to be a bad one from his perspective is irrelevant and does not warrant invalidating the quitclaim deed."

The ICA further concluded that Ray "freely and voluntarily entered into the agreements." Specifically, the ICA noted that both Ray and Sandra were well educated, and that "there is nothing in the record showing that [Sandra] used threats or any other improper methods of persuasion." The ICA also rejected Ray's argument that he never intended to convey his interest in the

Kahalakua property. The ICA explained that Ray's statements regarding intent "were inadmissible for purposes of contradicting the deed's clear language, under which he granted his interest in the [Kahalakua property] to [Sandra] as tenant in severalty." The ICA further explained that because the deed was unambiguous, extrinsic evidence of the facts and circumstances surrounding the execution of the deed was not "competent to contradict, defeat, modify or otherwise vary the meaning or legal effect of the deed." (Internal quotation marks and citation omitted). The ICA concluded, therefore, that the "Family Court erred in failing to classify the [Kahalakua property] as [Sandra's] separate property pursuant to the plain language of the deed."

In a concurring opinion, Judge Foley stated that unconscionability encompasses two basic principles: one-sidedness and unfair surprise, and indicated that both must be present in order for the doctrine to apply. Specifically, Judge Foley noted that, even assuming the quitclaim deed was one-sided, "nothing in the record indicates unfair surprise."

The ICA entered its judgment on appeal on October 3, 2013, and, on December 2, 2013, Ray timely filed an application for writ of certiorari. In his application for writ of certiorari, Ray presents two questions:

1. Whether the ICA erred in vacating the Family Court's decision that postmarital agreements were unenforceable because they were unconscionable.

2. Whether the ICA erred in vacating the Family Court's decision that postmarital agreements were unenforceable because they were involuntary.

## II. Standards of Review

### A. Construction of contract

"[T]he construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." *Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 239, 921 P.2d 146, 159 (1996). Unconscionability is a question of law this court reviews de novo. *See, e.g.,* HRS § 490:2–302(1) (2008). "Whether particular circum-

stances are sufficient to constitute … duress is a question of law, although the existence of those circumstances is a question of fact." *Gruver v. Midas Int'l Corp.*, 925 F.2d 280, 282 (9th Cir.1991) (citing Oregon law on economic duress).

## B. Findings of Fact and Conclusions of Law

 The family court's findings of fact are reviewed under the clearly erroneous standard. *Kakinami v. Kakinami*, 127 Hawai'i 126, 136, 276 P.3d 695, 706 (2012) (citation omitted). A finding of fact is clearly erroneous when "(1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *Id.* " 'Substantial evidence' is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.*

The family court's conclusions of law are reviewed de novo. *Id.*

### III. Discussion

At the outset, we must decide whether the quitclaim deed in fact constituted a separation agreement that altered the parties' rights to an equitable division of the couple's marital partnership property, such that Sandra must receive the entire value of the Kahalakua property pursuant to the deed. For the reasons set forth below, the answer to this threshold question is no. Accordingly, the ICA erred in concluding that the quitclaim deed was an enforceable separation agreement.

Because the quitclaim deed did not affect the disposition of the parties' property upon divorce, we must also decide whether the MOU is enforceable. For the reasons set forth below, the MOU is enforceable because it is not unconscionable and Ray entered into the agreement voluntarily. Because we conclude that the MOU is enforceable, we do not consider the enforceability of the October 6, 2008 handwritten agreement.

## A. The quitclaim deed was not an agreement to alter the division of Ray and Sandra's marital partnership property

 "In Hawai'i, there is no fixed rule for determining the amount of property to be awarded each spouse in a divorce action other than as set forth HRS § 580–47." *Kakinami*, 127 Hawai'i at 136–37, 276 P.3d at 706–06 (brackets and internal quotation marks omitted) (quoting *Tougas v. Tougas*, 76 Hawai'i 19, 26, 868 P.2d 437, 444 (1994)). Pursuant to HRS § 580–47(a), the family court has broad discretion to divide the estate of divorcing parties in a "just and equitable" manner. HRS § 580–47(a) (Supp.2011); *see also Kakinami*, 127 Hawai'i at 137, 276 P.3d at 706. This court has adopted the "partnership model of marriage" to guide the family court in its exercise of this discretion. *Kakinami*, 127 Hawai'i at 137, 276 P.3d at 706 (citing *Gussin v. Gussin*, 73 Haw. 470, 486, 836 P.2d 484, 492 (1992)). Pursuant to the partnership model, "the family court can utilize the following five categories of net market values (NMVs) as guidance in divorce cases":

Category 1. The [NMV], plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

Category 2. The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT [date of the conclusion of the evidentiary part of the trial.]

Category 3. The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

Category 4. The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in . category 3 and that the owner separately owns continuously from the date of acquisition to the DOCOEPOT.

Category 5. The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

*Id.* at 137–38, 276 P.3d at 706–07 (brackets in original).

 These NMVs generally determine the division of marital partnership property upon divorce. However, spouses may expressly contract for a different division of marital partnership property, and the family court must enforce all valid and enforceable agreements with regard to marital property division.[4] *See* HRS § 572–22 (2006) ("All contracts made between spouses . . . not otherwise invalid because of any other law, shall be valid."); *Epp v. Epp*, 80 Hawai'i 79, 87, 905 P.2d 54, 62 (App.1995). In addition, spouses may exclude certain assets from the marital partnership entirely, thereby segregating those assets as marital separate property. Marital separate property includes:

a. All property that was excluded from the marital partnership by an agreement in conformity with the Hawai'i Uniform Premarital Agreement Act (HUPAA), HRS chapter 572D (Supp.1992);

b. All property that was excluded from the marital partnership by a valid contract; and

c. All property that (1) was acquired by the spouse-owner during the marriage by gift or inheritance, (2) was expressly classified by the donee/heir-spouse-owner as his or her separate property, and (3) after acquisition, was maintained by itself and/or

sources other than one or both of the spouses and funded by sources other than marital partnership income or property. *Kakinami*, 127 Hawai'i at 138–39, 276 P.3d at 707–08 (brackets and ellipsis omitted) (emphasis added).

In the instant case, the quitclaim deed does not constitute either an express agreement to deviate from the partnership model of marital property division, or a valid contract converting the Kahalakua property into marital separate property.[5] Although the deed stated that Ray "remise[d], release[d] and forever quitclaim[ed]" his interest in the property to Sandra, nothing on the face of the deed indicates that it was intended to alter Ray's right to an equitable division of the property upon divorce, or to convert the property to marital separate property. Thus, although the language of the deed effectuated a change in who held title to the property, it was not, standing alone, sufficient to remove the property from the marital partnership. *See Riethbrock v. Lange*, 128 Hawai'i 1, 16 n. 9, 282 P.3d 543, 558 n. 9 (2012) (noting that awarding property solely on the basis of which spouse holds title would conflict with the partnership model of property division).

 Accordingly, this court must look to the circumstances surrounding the quitclaim deed to determine whether it was intended to alter the disposition of the Kahalakua property.[6] According to Ray, he signed the deed to protect the property from lawsuits, and he and Sandra intended to eventually "restore the title to joint ownership." However, according to Sandra, Ray signed the quitclaim

---

4. Spouses may contract regarding marital property rights in premarital, postmarital, or settlement agreements. Premarital or prenuptial agreements are entered into before marriage. *See, e.g., Prell v. Silverstein*, 114 Hawai'i 286, 287–88, 162 P.3d 2, 3–4 (App.2007). Postmarital or postnuptial agreements are entered into after marriage. *See, e.g., Chen v. Hoeflinger*, 127 Hawai'i 346, 352, 279 P.3d 11, 17 (App.2012). Settlement agreements are entered into after separation or in anticipation of immediate separation. *See, e.g., Bienvenue v. Bienvenue*, 102 Hawai'i 59, 61, 72 P.3d 531, 533 (App.2003).

5. The other two means of converting marital partnership property into marital separate prop-

erty—an agreement pursuant to the HUPAA or the special treatment of a gift or inheritance—are not implicated in the instant case.

6. Thus, the ICA erred in concluding that "[Ray's] statements regarding intent were inadmissible for purposes of contradicting the deed's clear language." Although the deed was unambiguous with respect to the transfer of title, it was ambiguous with respect to whether it was intended to alter the division of the property upon the parties' divorce. Accordingly, the ICA was incorrect in stating that "[t]he Family Court erred in failing to classify the Property as [Sandra's] separate property pursuant to the plain language of the deed."

deed because she told him, "I need security." Sandra further testified that, pursuant to the deed, she "gave up" the $100,000 due to her under the MOU in exchange for receiving the entire Kahalakua property.

The family court credited Ray's explanation for the quitclaim deed, finding that, "[a]fter discussions with Sandra, Ray thought the Quitclaim deed would protect the home from potential lawsuits, but title would be transferred back to joint ownership when things returned to normal." Although Sandra challenged this finding on appeal, it is supported by substantial evidence in the form of Ray's testimony. *In re Doe*, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) ("[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." (internal quotation marks and brackets omitted)). Accordingly, the family court's finding is not clearly erroneous, and it is therefore binding on this court.

 Based on the family court's finding, the parties did not intend the quitclaim deed to alter the disposition of their marital partnership property upon their divorce. Accordingly, the quitclaim deed did not bar the family court from equitably dividing the Kahalakua property. Thus, this court need not determine whether the quitclaim deed was unconscionable or agreed to under duress.[7]

We next must determine whether either of the parties' other two agreements are enforceable. In her appeal to the ICA, Sandra described the October 6, 2008 agreement, the MOU, and the quitclaim deed as a "series of agreements for their divorce," and maintained that each of the agreements was enforceable. However, Sandra also argued that, even if the family court's findings and conclusions regarding the quitclaim deed are affirmed, the October 6, 2008 agreement and subsequent MOU should nonetheless be enforced. Consistent with this view, Sandra continues to argue in this court that all three agreements are enforceable. Accordingly, we next consider whether the MOU is enforceable.

**B. In general, a postmarital agreement is unconscionable if it is impermissibly one-sided and is the result of unfair surprise**

 As stated, the family court must enforce all valid and enforceable postmarital and separation agreements. *See Epp*, 80 Hawai'i at 87, 905 P.2d at 62. A postmarital or separation agreement is enforceable if the agreement is "not unconscionable and has been voluntarily entered into by the parties with the knowledge of the financial situation of the [other] spouse." *See Lewis v. Lewis*, 69 Haw. 497, 501, 748 P.2d 1362, 1366 (1988); *see also Chen v. Hoeflinger*, 127 Hawai'i 346, 356–57, 279 P.3d 11, 21–22 (App.2012).[8] Ray

---

7. In general, a deed is not a contract. *See, e.g., Brown v. Brown*, 501 So.2d 24, 26 n. 1 (Fla.Dist. Ct.App.1986) ("As distinguished from covenants of warranty, et cetera, which are often in a deed but which are not essential to its character, a deed is not a contract. A deed does something (conveys land) as distinguished from promising to do something."). Nevertheless, to the extent the parties here treat the quitclaim deed as a contract, it is well settled that "there must be a meeting of the minds on all essential elements or terms in order to create a binding contract." *Moss v. Am. Int'l Adjustment Co.*, 86 Hawai'i 59, 63, 947 P.2d 371, 375 (1997) (internal quotations marks and citation omitted). Because Ray thought that the deed would protect the property from lawsuits and that title would eventually be restored to joint ownership, and Sandra thought that Ray signed the deed in order to provide her with "security," there plainly was no meeting of the minds with respect to the effect of the deed.

8. Some jurisdictions have concluded that postmarital agreements are subject to greater scrutiny than premarital agreements because of the nature of the marital relationship. *See, e.g., Bedrick v. Bedrick*, 300 Conn. 691, 17 A.3d 17, 27 (2011) ("This leads us to conclude that postnuptial agreements require stricter scrutiny than prenuptial agreements."). The dissent adopts such a view, arguing that "transactions between spouses should be subject to the general rules governing fiduciary relationships," and that "an agreement that [is] not in accordance with fiduciary standards should be presumptively involuntary and unenforceable." Dissent at 56, 332 P.3d at 658. Neither the family court nor the ICA concluded that a heightened standard should be applied in evaluating postmarital agreements, and neither party has argued that this court should apply such a standard. We therefore do not consider whether postmarital agreements should be subject to greater scrutiny than premarital agreements.

argues that the ICA applied the wrong legal standard for determining unconscionability. For the reasons set forth below, Ray's argument is without merit.

 Unconscionability encompasses two principles: one-sidedness and unfair surprise. *Lewis,* 69 Haw. at 502, 748 P.2d at 1366. One-sidedness (i.e., substantive unconscionability) means that the agreement "leaves a post-divorce economic situation that is unjustly disproportionate." *Id.* Unfair surprise (i.e., procedural unconscionability) means that "one party did not have full and adequate knowledge of the other party's financial condition when the [marital] agreement was executed." *Id.* A contract that is merely "inequitable" is not unenforceable.[9] *Id.* at 500, 748 P.2d at 1366. The unconscionability of an agreement regarding the division of property is evaluated at the time the agreement was executed. *See id.* at 507, 748 P.2d at 1369.

 Generally, "[a] determination of unconscionability ... requires a showing that the contract was both procedurally and substantively unconscionable when made," but there may be "exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824, 828–29 (1988); *see also Adler v. Fred Lind Manor,* 153 Wash.2d 331, 103 P.3d 773, 782 (2004) (en banc) ("individual contractual provisions may be so one-sided and harsh as to render them substantively unconscionable despite the fact that the circumstances surrounding the parties' agreement to the contract do not support a finding of procedural unconscionability"); *Maxwell v. Fidelity Fin. Servs., Inc.,* 184 Ariz. 82, 907 P.2d 51, 59 (1995) (concluding under state statute that "a claim of unconscionability can be established with a showing of substantive unconscionability alone"). Although some

courts have concluded that "[t]o be unenforceable, a contract must be both procedurally and substantively unconscionable," *see, e.g., Marin Storage & Trucking, Inc. v. Benco Contracting and Eng'g, Inc.,* 89 Cal. App.4th 1042, 1052, 107 Cal.Rptr.2d 645 (Cal. Ct.App.2001), most authorities have recognized that, in at least some cases, substantive unconscionability, without more, can render an agreement unenforceable, *see* Restatement (Second) of Contracts § 208 cmt. c (1981) ("Theoretically it is possible for a contract to be oppressive taken as a whole, even though there is no weakness in the bargaining process and no single term which is in itself unconscionable."); 7 Joseph M. Perillo, Corbin on Contracts § 29.1 at 377 (revised ed. 2002) ("Some cases hold that the defense of unconscionability cannot be invoked unless the contract or clause is both procedurally and substantively unconscionable, but there is no basis in the text of [Uniform Commercial Code § 2–302] for such a conclusion." (footnotes omitted)). Indeed, the courts of this state have recognized that, under certain circumstances, an impermissibly one-sided agreement may be unconscionable even if there is no unfair surprise.

 For example, in *Kuroda v. Kuroda,* 87 Hawai'i 419, 428, 958 P.2d 541 (App.1998), the court held that a postnuptial agreement was unconscionable where it awarded the wife all personal and real property held in common, implicitly allowed the wife to keep her personal property including her accounts, required the husband to pay the wife one half of his net income from every source until either spouse passed away, and required the husband to pay all attorney's fees and costs associated with the separation and divorce. The *Kuroda* court reached this conclusion without considering whether there was unfair surprise. Thus, although under Hawai'i law "two basic principles are encompassed within the concept of unconscionability, one-sidedness and unfair surprise," *Lewis,* 69 Haw. at 502, 748 P.2d at 1366, in certain circum-

---

**9.** Although the family court stated in the divorce decree that it would be "inequitable to enforce the agreements entered into by the parties," the family court's findings of fact and conclusions of law indicate that the family court concluded that "it would be unconscionable to award Sandra

the Kahala Kua property by enforcing the Quitclaim Deed," not merely "inequitable." The family court therefore applied the correct legal standard in determining whether the deed was unconscionable.

stances, one-sidedness alone can render an agreement unconscionable, *see Kuroda,* 87 Hawai'i at 428, 958 P.2d at 550.

Here, the ICA applied the correct legal standard in its memorandum opinion. Specifically, the majority stated that "there need not be both one-sidedness and unfair surprise in reaching a determination that a marital agreement is unconscionable." The ICA concluded, however, that the quitclaim deed was not "so outrageously oppressive as to be unconscionable in the absence of unfair surprise."

Ray nevertheless argues that instead of applying the well settled law, "the ICA held that a marital agreement is only enforceable if there is both one-sidedness and unfair surprise." Ray's description of the ICA's analysis does not accurately characterize the approach taken by that court. The ICA did not hold that one-sidedness, without more, would never be enough to find an agreement unconscionable. Instead, the ICA concluded that the deed was not so "one-sided that it is unconscionable even without a showing of unfair surprise." Thus, the ICA plainly applied the correct legal standard in considering the validity of the deed.

Ray also appears to argue that this legal standard is overly narrow. According to Ray, "a marital agreement is unenforceable if it is one-sided," and unconscionability in the context of marital agreements does not require a showing of unfair surprise. Put another way, Ray appears to argue that a marital agreement need not be exceptionally one-sided in order to be unconscionable. Ray further argues that requiring a showing of unfair surprise is absurd in the context of

postmarital agreements because spouses "are in an obvious[ly] better position to be knowledgeable about their spouse's financial condition."

Ray's arguments are without merit. First, Ray does not cite to any cases invalidating a postmarital agreement solely on the basis of that agreement being somewhat one-sided.[10] Furthermore, parties may have legitimate reasons for entering into a somewhat one-sided postmarital agreement, and may do so knowingly and voluntarily. Permitting the family court to invalidate such agreements without requiring a showing of extraordinary one-sidedness would frustrate the purpose of HRS § 572–22, which permits spouses to enter into enforceable contracts with each other.

Accordingly, the ICA applied the correct legal standard in evaluating unconscionability.

## C. The MOU is not unconscionable

&#9632; Ray argues that the marital agreements were one-sided and therefore unconscionable.[11] In her response to this court, Sandra agrees that it would be one-sided to award the Kahalakua property to her in its entirety pursuant to the deed. Sandra argues, however, that the MOU is not "unjustly disproportionate" because Ray would receive 25% of the proceeds of the sale of the property, in addition to any cash accounts and retirement benefits awarded by the family court. (Citing *Chen,* 127 Hawai'i at 357, 279 P.3d at 22).

Although the family court did not address whether the MOU is unconscionable, this court may nonetheless reach the issue be-

---

10. Ray cited two cases involving unconscionability in divorce actions. The first, *In re Marriage of Thomas,* 199 S.W.3d 847, 860 (Mo.App.2006), does not support Ray's argument because the court there noted that parties are bound to the provisions of a pre-nuptial agreement "only if the agreement was conscionable and fairly made," i.e., both substantively and procedurally conscionable. *Id.* at 852 (emphasis added). Additionally, the court emphasized a similar standard of one-sidedness as that articulated by the ICA: "An agreement is unconscionable when the inequality is so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." *Id.* (internal quotation

marks and citation omitted). Similarly, in the second case, *In re Marriage of Manzo,* 659 P.2d 669, 671 (Colo.1983), the court considered both whether the agreement was procured through "overreaching, fraud, concealment of assets, or sharp dealing," and whether it was substantively "fair, just and reasonable." *Id.* at 675.

11. Nothing in the record suggests that Ray was surprised by the terms of the MOU, and Ray did not argue otherwise in his answering brief or application. The only issue, therefore, is whether the MOU was so impermissibly one-sided that it is unconscionable.

cause unconscionability is a question of law, reviewable de novo. *See, e.g.*, HRS § 490:2–302(1). For the reasons set forth below, the MOU is not unconscionable with respect to the division of the Kahalakua property, nor is it unconscionable to the extent it required Ray to pay Sandra $100,000 in lieu of alimony.[12] The MOU is therefore an enforceable marital agreement with regard to these clauses.

Again, the terms of the MOU were as follows:

> This Agreement between Donald Balogh and Sandra Balogh will be implemented if they are to separate and/or divorce from each other.
>
> Their assets will be divided as follows:
>
> . . . .
>
> 3. In regards to the proceeds of the house, due to a sale: Sandy will receive 75% of the sale proceeds and Ray will receive 25% of the proceeds.
>
> 4. In regards to compensation: Ray agrees to pay $100,000.00 to Sandy in lieu of Alimony and court proceedings.

Even if the allocation of the entire Kahalakua property to Sandra pursuant to the quitclaim deed could be characterized as so one-sided as to have been unconscionable, the 75%/25% split set forth in the MOU and the requirement that Ray pay $100,000 in lieu of alimony are not. First, in addition to his share of the Kahalakua property, Ray was entitled to an equitable share of the couple's other major assets, which totaled $760,000.[13] Second, although Ray will receive a lesser share of the proceeds under the MOU than he would under the family court's 50%/50% division of the property, such imbalance was the express purpose of the MOU. As the family court found, "Sandra believed Ray would tell her the truth and stop his inappropriate behavior by signing the MOU. Ray

signed it in his desperate attempt to hold the marriage together." It is unlikely that the MOU would have been construed as demonstrative of Ray's commitment to the marriage had it provided for the same division of property Ray was likely to receive in the family court under an equitable division upon divorce. Moreover, as noted above, "unless the agreement rises to the level of unconscionability, a merely 'inequitable' contract is not unenforceable under contract law." *Lewis*, 69 Haw. at 500, 748 P.2d at 1365–66. Accordingly, the 75%/25% division of the Kahalakua property and the $100,000 payment set forth in the MOU are not unconscionable.

## D. The MOU was entered into voluntarily

■ Ray also argues that the ICA erred in vacating the family court's decision because he did not enter into each of the marital agreements voluntarily. For the reasons set forth below, Ray executed the MOU voluntarily.[14]

■ "Involuntariness is shown by evidence of 'duress, coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness.'" *Chen*, 127 Hawaiʻi at 357, 279 P.3d at 22 (quoting *Prell*, 114 Hawaiʻi at 298, 162 P.3d at 14). Here, the family court concluded that Ray was "under duress and coercion when he signed the agreements" because of the ongoing construction of the Kahalakua home, the contractor walking off and the resulting mechanic's lien, the penalties assessed by the homeowner's association and the resulting litigation, the demands of Ray's job, the continuing issues with subcontractors, and Ray's uncontrollable obsessive behavior. The family court's factual findings, however, are not sufficient to support a conclusion that Ray

---

12. Although the MOU also addressed Ray's tools and building equipment, the contents of the house, and the couple's vehicles, the disposition of those items is not being disputed by the parties.

13. The record does not indicate the exact values of Ray's and Sandra's respective shares of their other assets. Based on the family court's calcu-

lations, however, it appears that Ray and Sandra each received about half of the other assets.

14. For the reasons stated above, this court need not address whether the quitclaim deed was voluntarily executed. Moreover, because we conclude that the MOU is enforceable, we do not consider the voluntariness of the October 6, 2008 agreement.

signed the agreements under either duress or coercion.[15]

■ Duress is defined as "a threat of harm made to compel a person to do something against his or her will or judgment; [especially], a wrongful threat made by one person to compel a manifestation of seeming assent by another person to a transaction without real volition." *Black's Law Dictionary* 614 (10th ed. 2014). It is well established that an agreement is voidable due to duress when "a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative." *Standard Fin. Co., Ltd. v. Ellis*, 3 Haw.App. 614, 621, 657 P.2d 1056, 1061 (1983) (quotation marks and citation omitted); *see also* Restatement (Second) of Contracts § 175(1) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.").[16]

■ A threat of divorce does not constitute an improper threat since the party making it has the legal right to seek a divorce. *See Kam Chin Chun Ming v. Kam Hee Ho*, 45 Haw. 521, 558, 371 P.2d 379, 402 (1962) (it is not duress for a party to "threaten to do what they had a legal right to do"); *see also Rubenstein v. Sela*, 137 Ariz. 563, 672 P.2d 492, 494 (Ariz.Ct.App.1983) (concluding that husband's threat to leave the marriage did not constitute duress because he had a right to leave the marriage); *Autin v. Autin*, 617 So.2d 229, 233 (La.Ct.App.1993) (holding that "a threat of doing a lawful act or a threat of

exercising a right does not constitute duress").

However, a threat of exposure of publicly embarrassing information can be the basis of a claim of duress. *See* Restatement (Second) of Contracts § 176(2) ("A threat is improper if the resulting exchange is not on fair terms, and . . . the threatened act would harm the recipient and would not significantly benefit the party making the threat"); *id.* cmt. f ("A typical example is a threat to make public embarrassing information concerning the recipient unless he makes a proposed contract.").

The record here does not support a finding that Ray's assent to the MOU was induced by an improper threat by Sandra and that he had no reasonable alternative to signing that agreement. There was conflicting testimony regarding whether Sandra had threatened Ray in order to get him to sign any of the documents. Sandra repeatedly testified that she did not threaten Ray in connection with the two agreements and the deed. Ray testified at one point that Sandra had told him that if he did not sign, she would tell family members about his behavior and that she would "go public" with that information.[17]

In its findings of fact and conclusions of law, however, the trial court did <u>not</u> find that Sandra had threatened Ray. Rather, it simply identified a number of factors that contributed to Ray's "extreme distress," ranging from problems with the construction to "his uncontrollable obsessive behavior that escalated from his backyard nudity to public display, his shame and embarrassment, his fear

---

15. It appears that the family court used the terms duress and coercion interchangeably, i.e., there is nothing in the Findings of Fact and Conclusions of Law to indicate that the court viewed them as legally distinct terms. We address each doctrine separately.

16. Section 175(2) of the Restatement concerns improper threats made by a third party to induce the recipient to enter into a contract. However, Ray does not contend, and the record does not suggest, that any third party threatened Ray to enter into the agreements.

17. At another point Ray appeared to deny that Sandra had threatened him. However, this testimony was subject to an objection that was sustained by the court:

> Q. So was it—was there a—threat of divorce or exposure to others—
> A. No.
> Q. —or—
> MR. HIOKI: Objection, leading, Your Honor.
> THE COURT: Getting there. Sustained. Rephrase the question.

(Emphasis added).

Sandra argues that because the answer was not stricken from the record, it is in evidence. Even assuming arguendo that Ray's response can be considered, the fact remains that there was conflicting testimony on this issue, and the family court implicitly resolved those conflicts in Sandra's favor when it declined to find that she had threatened Ray.

of being discovered, and the constant argument with Sandra about his inappropriate behavior." Moreover, Ray failed to establish that he had no reasonable alternative to signing the MOU. Ray could have declined to sign the MOU but still attempted to resolve his issues with Sandra in an effort to save the marriage. In sum, because the family court did not make a finding that Sandra had improperly threatened Ray, and since Ray had a reasonable alternative to signing the MOU, the record does not support the family court's conclusion that Ray signed that agreement under duress.

■ The record also does not support a conclusion that the MOU was the result of coercion. Coercion is defined as "[c]ompulsion of a free agent by physical, moral, or economic force or threat of physical force." *Black's Law Dictionary* 315 (10th ed. 2014). "Coercion sufficient to avoid a contract need not . . . consist of physical force or threats of it. Social or economic pressure illegally or immorally applied may be sufficient." *Biliouris v. Biliouris,* 67 Mass.App.Ct. 149, 852 N.E.2d 687, 693 (2006). For all the reasons set forth above, the record does not support a conclusion that Sandra employed physical, moral, or economic force to obtain Ray's assent.

Although the family court found Ray was under stress due to a variety of factors, those factors do not establish either duress or coercion. Moreover, Ray cannot rely on those factors to establish that he lacked mental capacity when he signed the agreements, since he had specifically agreed prior to trial that he was "not claiming lack of mental capacity as to any issue herein." Ray therefore executed the MOU voluntarily.

In sum, the record does not support the family court's conclusion that Ray's assent to the MOU was the product of duress and coercion. The dissent does not dispute that analysis, but rather suggests that the family court did not intend to rely specifically on those doctrines, as opposed to other potential grounds for finding that Ray's assent was involuntary. *See* Dissent at 49–50, 332 P.3d at 651–56. Respectfully, the family court's Conclusion of Law P quite specifically refers to "duress and coercion" as the basis for

invalidating the agreement, and the court's accompanying citation to the *Prell* case implies that its reliance on those two doctrines was intentional.

In any event, we respectfully disagree with the dissent's contention that Ray did not enter into the MOU voluntarily because his "mental state was extremely vulnerable", he was unduly influenced, and "other circumstances" demonstrate involuntariness. Dissent at 51, 53–54, 52–53, 332 P.3d at 653, 655–56, 654–55. First, to the extent the dissent suggests that Ray's "mental state" deprived him of the capacity to contract, Ray explicitly agreed prior to trial that he was not claiming a lack of mental capacity.

Second, the record does not establish that Ray was unduly influenced. Undue influence is "[t]he improper use of power or trust in a way that deprives a person of free will and substitute's another's objective." *Black's Law Dictionary* 1760 (10th ed. 2014); *Cvitanovich–Dubie v. Dubie,* 125 Hawai'i 128, 160, 254 P.3d 439, 471 (2011). As a threshold matter, the family court did not find that Sandra exerted undue influence over Ray, and Ray does not argue otherwise in this court. Moreover, the record does not support a conclusion that Sandra either attempted to impose or actually imposed <u>improper</u> influence on Ray.

Finally, there are no "other circumstances" indicating a lack of free will on Ray's part. The dissent asserts that Ray was motivated by saving the marriage and that Ray believed he had no other choice but to sign the agreements. Dissent at 53, 332 P.3d at 655. The facts of this case, however, do not support a conclusion that Ray executed the MOU involuntarily. As noted above, Ray was well educated, with a bachelor's and master's degree in electrical engineering, and he held a high-level security clearance. There is no suggestion in the record that Ray was unaware of what he was doing, nor do the facts otherwise support a conclusion that the MOU was the result of a lack of free will. In fact, Ray expressly testified that he agreed to all of the terms of the MOU. While Ray was under stress from a number of

sources, that stress is not sufficient to establish that the MOU was not entered into voluntarily.

The dissent also asserts that the MOU is voidable for a lack of consideration. Dissent at 56, 332 P.3d at 658. The family court, however, made no findings or conclusions relating to the adequacy of consideration, and Ray has made no argument in this regard to this court. Thus we do not consider the issue.

We therefore vacate the family court's conclusions of law N, P (in part), Q, and R. We vacate conclusion of law N because the family court treated the quitclaim deed as a separation agreement. We vacate conclusion of law P to the extent the family court concluded that Ray signed the agreements under duress and coercion. We vacate conclusion of law Q because the family court concluded that the parties' agreements were unenforceable. Finally, we vacate conclusion of law R because it awarded Ray and Sandra each a fifty-percent interest in the Kahalakua property.

## IV. Conclusion

For the foregoing reasons, the ICA's judgment is vacated, the family court's divorce decree is vacated, and the family court's findings of fact and conclusions of law are affirmed in part and vacated in part. The case is remanded to the family court for further proceedings consistent with this opinion.

1. The quoted statements are from the findings of facts (FOF) of the family court and were not contested on appeal. Sandra challenged only two of the family court's FOF. First, Sandra challenged FOF 48, in which the family court determined that on August 15, 2009, Sandra told Ray he should leave, and Ray reluctantly agreed. Second, Sandra challenged FOF 53, which credited Ray's explanation for the Quitclaim deed: "After discussions with Sandra, Ray thought the Quitclaim Deed would protect the home from potential lawsuits, but title would be transferred back to joint ownership when thing[s] returned to normal." The majority concluded that this finding was not clearly erroneous, and therefore binding on this court. Majority at 41, 332 P.3d at 643.

All of the family court's remaining FOF are binding on this court. *See Bremer v. Weeks*, 104

Amended Concurring and Dissenting Opinion by POLLACK, J.

## I. Background

In the period leading up to the signing of the "agreements" at issue in this case, Sandra Balogh's (Sandra) and Donald Balogh's (Ray) marriage was deteriorating. "There was constant shouting and screaming. It was an ugly situation with no communication between the parties."[1] *Id.* Ray was under heavy stress as he was unable to control his exhibitionist behavior even though he knew it was wrong.[2] Ray was also out of work at the time of the signing of the "agreements" in October 2008, having just retired a few months earlier.

After months of arguments, Sandra told Ray "if he were serious about being committed to the marriage, then they should 'write something up.'" On October 6, 2008, Sandra dictated to Ray the terms of an "agreement" to save their marriage, which Ray handwrote on a single sheet of blank paper (October 6 Document). The October 6 Document provided that if the couple separated, Sandra would receive 75% of the proceeds from the sale of the couple's residence, the entire contents of the house excluding Ray's tools and clothes, and the couple's vehicles. "Ray believed that if he did not sign the note, he would lose his wife of 30 years and everything they had worked for together." Ray "was not in his right mind" when he signed the October 6 Document. The express terms of the handwritten "agreement" provided no consideration for Ray's relinquishment of

Hawai'i 43, 63, 85 P.3d 150, 170 (2004) ("findings of fact that are not challenged on appeal are binding on the appellate court" (quotation marks, brackets, and ellipsis omitted)).

Sandra challenged Conclusions of Law N, O, P, Q, R, and S.

2. Exhibitionism, which involves exposing one's genitals to an unsuspecting person, falls under the psychiatric sexual disorders category of paraphilias, "any intense and persistent sexual interest other than ... with ... consenting human partners." *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 685, 689 (5th ed. 2013) *available at* http://dsm.psychiatryonline.org/content.aspx?bookid=556&sectionid=41101785, http://dsm.psychiatryonline.org/content.aspx?bookid=556&sectionid=41101785#103442356.

half of his interest in their home.[3] The family court found that when Sandra signed the October 6 Document, she "was not thinking about divorce, she took Ray's signing as a show of his commitment to the marriage."

Less than three weeks after the October 6 Document had been signed, Sandra and Ray signed a second "agreement," entitled "Memo of Understanding" (MOU). During this two-week interval, there was no change in Ray's emotional state. Indeed, the family court's uncontested finding was that "[t]he parties signed the MOU with the intent that they would work on the marriage, especially Ray. Sandra believed Ray would tell her the truth and stop his inappropriate behavior by signing the MOU. Ray signed it in his desperate attempt to hold the marriage together." The MOU provided that in the event of a divorce, in addition to Sandra receiving the 75% share of the property, contents of the home, and vehicles, Ray was required to give Sandra $100,000.00 "in lieu of Alimony and court proceedings." There was no consideration stated in the MOU for the additional property that Sandra would receive in the event of a divorce.

By August 2009, the marriage had reached its breaking point. Ray admitted to Sandra that he was continuing to expose himself, and he "reluctantly agreed to move" after Sandra told him that "he should leave."[4] Before leaving, Ray called his relatives, and during the call, Sandra overheard Ray say to his sister "maybe divorce." As a result of overhearing this comment, "Sandra got upset and demanded [Ray] sign over the house as security." Sandra wanted Ray to work on the marriage, and Ray agreed to sign a quitclaim deed both to protect the asset and to show further commitment to the marriage. As "security," Ray and Sandra executed a deed dated September 1, 2009, purporting to transfer 100% interest in the property to Sandra (Quitclaim Deed). Sandra conceded in her brief to the ICA that the Quitclaim

Deed was one-sided. Sandra believed Ray signed the Quitclaim Deed because he was serious about saving the marriage.

Ray stated that he was "not in his right mind when [he] signed these documents." It is uncontested that "[e]ach time, Ray believed he could salvage the marriage by signing these agreements. He would have signed anything to save their thirty-year marriage. He was in a panic." (Emphasis added). The family court found that Ray also believed the Quitclaim Deed was only a temporary agreement that would protect the home from potential lawsuits, and the title would eventually transfer back to joint ownership.[5]

The family court concluded that Ray and Sandra

> were motivated to save their marriage when they signed the various agreements. When Ray signed the Quitclaim Deed, Ray was protecting their marital home from potential lawsuits and had no intent of permanently transferring his interest to Sandra. Neither party intended their marriage to result in a divorce and to divide their marital estate accordingly.

Not surprisingly, based upon these uncontroverted facts, the family court concluded that all three "agreements" were not enforceable based upon the combined influence of numerous stressors that were affecting Ray when the "agreements" were signed. The family court concluded that "Ray was suffering from extreme distress" due to: (1) the ongoing construction of the Kahala Kua residence; (2) the contractor's walk-off and lawsuit in 2006; (3) the penalties assessed by the couple's homeowner's association, Association of Owners of Kahala Kua aka Kahala Kua Community Association (AOAO) and the parties' lawsuit against the AOAO; (4) his high security clearance job that also required twenty-four hour/seven days on call one week a month; (5) the continuing issues with the

---

3. The fair market value of the residential property was 1.6 million dollars.

4. As noted, *see supra* note 1, Sandra contested the family court's finding in FOF 48 that she told Ray that he should leave.

5. As noted, *see supra* note 1, Sandra contested the family court's finding in FOF 53 that "[a]fter discussions with Sandra, Ray thought the Quitclaim Deed would protect the home from potential lawsuits, but title would be transferred back to joint ownership when thing[s] returned to normal."

subcontractors; (6) his uncontrollable obsessive behavior that escalated from his backyard nudity to public display; (7) his shame and embarrassment; (8) his fear of being discovered; and (9) the constant argument with Sandra about his inappropriate behavior. The tenth reason stated by the family court was that while all of the other circumstances were occurring, Sandra suspected Ray of infidelity, which further exacerbated the marital relationship and escalated the tension and the friction in their home. Accordingly, the family court concluded that "Ray was thus under duress and coercion when he signed the agreements."

The family court also concluded that "[a]fter 30 years of marriage ... it would be unconscionable to award Sandra the [home] by enforcing the Quitclaim Deed." The family court based its conclusion of unconscionability on its finding that Ray "would in essence receive 0% of the marital estate if" the agreements were enforced.[6]

In vacating the family court's detailed findings and analysis, the majority's decision to uphold the MOU implies that a contract between spouses in a deteriorating marriage should be evaluated as if the partners were engaging in arm's length negotiations, without appropriate consideration of the vulnerabilities and unequal power inherent in a breakdown of a marriage. By applying a standard used to evaluate contracts in a commercial context and requiring Ray to show specific evidence of an "improper threat" and the absence of a "reasonable alternative" to prove involuntary assent to a contract between marital partners, the majority's decision unduly constricts the law. Moreover, by not acknowledging the emotional nature of a marriage and its effects on "bargaining" between the spouses, the decision creates a precedent that permits an emotionally stronger spouse to take advantage of a more vulnerable one.

6. As noted, see supra note 1, Sandra contested the foregoing conclusion of law (COL) of the family court, except that Sandra did not challenge the conclusion that Ray would "in essence" receive 0% of the marital property if the home were awarded to Sandra, in COL M.

7. I concur with the ultimate result of the majority's holding that the "quitclaim deed did not bar

## II. Discussion

I would affirm the family court's determination that the Quitclaim Deed was unconscionable and therefore unenforceable.[7] Based on the determination that the Quitclaim Deed was unenforceable as unconscionable, I would not reach the majority's conclusion that that Quitclaim Deed did not alter the division of property. *Majority* at 40–41, 332 P.3d at 642–43.

I would also uphold the family court's implicit conclusion that Ray's assent to the October 6 Document and the MOU was involuntary. The family court's conclusion that the agreements were unenforceable is sustained by the family court's detailed FOFs that were largely uncontested on appeal and firmly supported by the record. These uncontested facts provide multiple bases to support the family court's determination that Ray's assent to the October 6 Document and the MOU was involuntary. Further, in line with the approach taken by many other states, I would hold that spouses are fiduciaries of each other, and therefore contracts between spouses that affect the division of property in the event of a divorce should be evaluated under that standard. Alternatively, I would hold that, as a threshold matter, the October 6 Document and the MOU are void for lack of consideration.

### A. The Quitclaim Deed is unconscionable

A postmarital or separation agreement is enforceable if it is not unconscionable and has been voluntarily entered into by the parties with knowledge of the financial situation of the other spouse. *See Lewis v. Lewis*, 69 Haw. 497, 500–01, 748 P.2d 1362, 1366 (1988).

Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties

the family court from equitably dividing [Ray and Sandra's] property," *Majority* at 40, 332 P.3d at 642, inasmuch as that holding renders the Quitclaim Deed as essentially without legal effect, although I would find the Quitclaim Deed unenforceable because of unconscionability. I dissent as to the majority's treatment of the remaining two "agreements."

together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction.

*Siopes v. Kaiser Found. Health Plan, Inc.*, 130 Hawai'i 437, 458, 312 P.3d 869, 890 (2013) (quoting *City & Cnty. of Honolulu v. Midkiff*, 62 Haw. 411, 418, 616 P.2d 213, 218 (1980)). Unconscionability typically encompasses two principles: one-sidedness and unfair surprise. *Lewis*, 69 Haw. at 502, 748 P.2d at 1366. In the context of postmarital agreements, however, one-sidedness alone can render an agreement unconscionable and therefore unenforceable. *See Kuroda v. Kuroda*, 87 Hawai'i 419, 428, 958 P.2d 541, 550 (App.1998); *Majority* at 42–43, 332 P.3d at 644–45.

Here, it is the uncontested COL of the family court that Ray "would in essence receive 0% of the marital estate if Sandra is awarded [the home]." Furthermore, Sandra acknowledged that enforcing the Quitclaim Deed "would be 'one-sided'. . . ." It is hard to envision an agreement that is more one-sided than an agreement that gives one spouse 100% of the marital estate and the other spouse 0%. The family court correctly concluded that:

> It would be unconscionable to award Sandra the [home] by enforcing the Quitclaim Deed. *Kuroda v. Kuroda*, 87 Hawai'i 419, 958 P.2d 547 [541] (App.1998); *Lewis v. Lewis*, 69 Haw. 497, 748 P.2d 1362 (1988).

Therefore, the finding of the family court should be affirmed.

## B. The "agreements" are unenforceable because Ray's assent was involuntary.

Although the family court concluded that Ray was "under duress and coercion when he signed the agreements," the majority determines that Ray's assent was "voluntary" because the family court's findings are not suf-

ficient to support duress. *Majority* at 45, 332 P.3d at 647. According to the majority, duress cannot be shown because: (1) the trial court did not make specific findings that Sandra had improperly threatened Ray; and (2) Ray could not show that he had no reasonable alternative to signing the MOU. In so concluding, the majority errs by incorrectly restricting its involuntariness inquiry to duress.

## 1. The correct Hawai'i standard for the enforceability of postmarital agreements

A postmarital agreement is not enforceable if it is entered into involuntarily. "When a premarital agreement setting forth support and property division in the event of divorce is not unconscionable and has been voluntarily entered into by the parties with knowledge of the financial situation of the prospective spouse, enforcement of the agreement does not violate the principle of a 'just and equitable' award under [Hawai'i Revised Statutes (HRS)] § 580–47."[8] *Lewis*, 69 Haw. at 500–01, 748 P.2d at 1366. "Involuntariness is shown by evidence of 'duress, coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness.'" *Chen v. Hoeflinger*, 127 Hawai'i 346, 357, 279 P.3d 11, 22 (App.2012) (emphasis added) (quoting *Prell v. Silverstein*, 114 Hawai'i 286, 298, 162 P.3d 2, 14 (App.2007)). Therefore, under Hawaii's controlling legal standard for the enforceability of postmarital contracts, involuntariness may be shown not only by duress, but also by coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness.

## 2. The family court found that Ray's assent was involuntary.

After listing ten contributing factors to Ray's stress, as noted above, Conclusion of Law (COL) P determined that:[9]

---

8. At the time the "agreements" in this case were signed, this statute provided, in relevant part:

> Upon granting a divorce ... the court may make any further orders as shall appear just and equitable ... finally dividing and distributing the estate of the parties, real, personal, or

mixed, whether community, joint, or separate[.]

HRS § 580–47 (1997). This language was identical at the time of *Lewis*. HRS § 580–47 (Supps. 1969, 1986).

9. Although COL P is set out as a conclusion of law, "the trial court's label is not determinative

Ray was thus under <u>duress and coercion</u> when he signed the agreements. *Prell v. Silverstein*, 114 Hawai'i 286, 162 P.3d 2 (Haw.App.2007).

(Emphasis added). While the family court referred to "duress and coercion" without using the word "involuntary," its specific citation to *Prell* makes it plain that the family court intended "duress and coercion" to convey involuntariness.[10] This is manifest because Prell defines duress and coercion as sufficient to demonstrate involuntariness, but not as the exclusive method of doing so. In the context of evaluating a premarital agreement, *Prell* states: "[n]o evidence was adduced that [spouse] signed the premarital agreement under duress, coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness." 114 Hawai'i at 298, 162 P.3d at 14. That is, *Prell* references "duress" as one "circumstance" of several "indicating [a] lack of free will or voluntariness." *Id.*

Thus, by describing the totality of the circumstances, including Ray's uncontrollable behavior, extreme stress, fear of being discovered, and the escalating tension in the relationship, then concluding that Ray was under duress and coercion, and then citing to *Prell*, the family court implicitly found that Ray's assent to the agreements was involuntary. To conclude otherwise infers that the family court, despite citing the controlling authority that sets forth the standard for

voluntariness in postmarital contracts, did not understand and apply the law that it cited.[11]

Voluntariness is a question of fact. *See State v. Price*, 55 Haw. 442, 443, 521 P.2d 376, 377 (1974) (in the context of a search, holding that voluntariness is a question of fact). The family court was in the best position to make factual findings. *In re Doe*, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) ("[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact.").

A family court's FOF are reviewed under the "clearly erroneous" standard. *In re Doe*, 101 Hawai'i 220, 227, 65 P.3d 167, 174 (2003). A FOF is only "clearly erroneous" when "(1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made."[12] *Id.* Therefore, it is improper for this court to disregard the family court's findings of fact regarding voluntariness if the findings of the family court are supported by substantial evidence.

### 3. Substantial evidence supports finding that Ray's assent was involuntary

The family court's uncontested FOFs support a conclusion that Ray's assent to the

---

of the standard of review." *Crosby v. State Dep't of Budget & Fin.*, 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994).

A circuit court's FOF are reviewed on appeal under the "clearly erroneous" standard whereas its COL are not binding upon an appellate court and are usually reviewed under the right/wrong standard. *Estate of Klink ex rel. Klink v. State*, 113 Hawai'i 332, 351, 152 P.3d 504, 523 (2007). A COL that "is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned." *Id.* (brackets omitted). "However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." *Id.* In other words, because the family court's COL P is a "determination that embraces an ultimate fact[,]" it "is a factual finding subject to the clearly erroneous standard of review even though classified as a COL." *Crosby*, 76 Hawai'i at 340, 876 P.2d at 1308.

10. This same test is utilized by the majority in its analysis. See Majority at 45, 332 P.3d at 647.

11. Assuming arguendo that COL P is ambiguous as to whether the family court intended "duress and coercion" to mean involuntariness, then the case should be remanded to the family court for clarification. "'Because ... findings [of fact] are imperative for an adequate judicial review of a lower court's conclusions of law,' we have held 'that cases will be remanded when the factual basis of the lower court's ruling cannot be determined from the record.'" *State v. Hutch*, 75 Haw. 307, 331, 861 P.2d 11, 23 (1993) (quoting *State v. Anderson*, 67 Haw. 513, 514, 693 P.2d 1029, 1030 (1985)).

12. Substantial evidence is credible evidence of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. *In re Doe*, 101 Hawai'i at 227, 65 P.3d at 174.

"agreements" was involuntary.[13] First, as noted above and set forth in COL P, the family court found that among the multiple factors contributing to the coercion and duress that led to Ray's involuntary assent were: his exhibitionist behavior and the associated repercussions from that behavior, including the letters from the AOAO, confrontations with the police at Makapu'u, and being banned from Ala Moana; the litigation and construction problems associated with the home; and his "high security clearance job."

Second, the facts demonstrate that Ray's mental state was extremely vulnerable. The family court described Ray as "unable to control his inappropriate behavior"; "extremely embarrassed but still unable to control his impulses"; and "distraught that he had no control over and did not know what to do about his inappropriate behavior. He "felt his brain was fried"; "fearful of his behavior being made" public; "not in his right mind"; "desperate"; and "in a panic." Following the first two "agreements," Ray's exhibitionist behavior escalated, including two letters from the homeowners' association; an incident at Makapu'u Trail; and an incident at Ala Moana. These findings of fact are uncontested. Therefore, Ray's mental state was plainly vulnerable, increasing the likelihood that duress or undue influence

was instrumental in gaining his assent and reducing the likelihood that his assent to the agreements was voluntary.[14]

Third, Sandra was drafting the "agreements." Sandra dictated the October 6 Document to Ray. Sandra also prepared the MOU, which added the $100,000 payment to her in the event of a divorce. Therefore, in light of Sandra having drafted the "agreements," the likelihood that Ray's assent to the "agreements" was involuntary was increased.

Fourth, the uncontested facts are that Ray felt he had no choice but to sign the "agreements." As to the October 6 Document, "Ray believed if he did not sign this note, he would lose his wife of thirty years and everything they had worked for together." As to the MOU, "Ray signed it in his desperate attempt to hold the marriage together." As to all three "agreements," "each time, Ray believed he could salvage the marriage by signing these agreements. He would have signed anything to save their thirty-year marriage. He was in a panic."

Thus, there is substantial evidence in the record indicating that Ray's assent to the three "agreements" was induced by circumstances indicating a lack of free will or voluntariness.[15] Accordingly, the family court's

---

13. The "agreements" should be examined together for several reasons. First, the circumstances under which the "agreements" were executed were virtually identical. The October 6, 2008 agreement and the MOU were signed within three weeks of each other, during which time the tension between Ray and Sandra was high and had not dissipated. As noted above, "Each time, Ray believed he could salvage the marriage by signing these agreements. He would have signed anything." Second, the subject matter of the agreements is also the same, providing essentially the same triggering event, i.e. separation or divorce. Finally, three of the four provisions of the MOU are the same as the three provisions of the October 6 Document. Therefore, all the "agreements" should be considered together when evaluating the voluntariness of Ray's assent.

14. The majority notes Ray's education, degrees, and high-level security clearance as an indication that Ray was aware of what he was doing. Majority at 45, 332 P.3d at 647. However, Ray never asserted that he was not aware; instead his contention is that his stress and efforts to preserve his marriage indicated a lack of free

will. The majority also notes that Ray "expressly testified that he agreed to all the terms of the MOU." *Id.* Again, Ray never denied agreeing to the terms of the "agreements." The issue was whether his assent was voluntary under the circumstances.

15. The majority suggests that because Ray waived the defense of lack of capacity, he also waived the defense of involuntariness. Majority at 50, 332 P.3d at 652. However, involuntariness is distinct from a defense of lack of capacity. *See* Grace M. Giesel, *A Realistic Proposal for the Contract Duress Doctrine*, 107 W. Va. L. Rev. 443, 448 (2005) ("Situations of limited decisional capacity or flawed decisional capacity are not duress and should be irrelevant to duress."). Incapacity to contract means that the person was "incapable of understanding the nature and effect of the transaction at the time the instrument was executed." *Pontes v. Pontes*, 40 Haw. 620, 623 (Haw.Terr.1954). *See also* 5 Williston on Contract § 10:3 (4th ed.) (Mental incompetence renders transactions voidable); Restatement (Second) of Contracts § 15 (1981). Consequently, a capacity to enter into contracts does not

implicit finding that Ray's assent was involuntary was not clearly erroneous and should be upheld.

### 4. "Other circumstances" indicates that Ray's assent was involuntary

Involuntariness in postmarital contracts may be shown by evidence of "any other circumstance indicating lack of free will or voluntariness." *Chen*, 127 Hawai'i at 357, 279 P.3d at 22; *Prell*, 114 Hawai'i at 298, 162 P.3d at 14. Because "other circumstances" is broadly inclusive, it is similar to a totality of the circumstances rule, under which a court's "inquiry will not be unfairly limited." *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 117, 899 P.2d 393, 400 (1995) (defining totality of the circumstances as a part of determining, in a tort action, the foreseeability of a criminal act committed by a third party). A totality of the circumstances "inquiry is broad enough to examine other factors as well." *Id.* Other states have used a totality of circumstances approach in assessing the enforceability of postmarital agreements.

For example, in *Pacelli v. Pacelli*, 319 N.J.Super. 185, 725 A.2d 56 (N.J.Super.Ct.App.Div.1999), the New Jersey Superior Court closely scrutinized and carefully evaluated a "mid-marriage" [16] agreement because it left the husband, a sophisticated businessman, and wife, a much younger, uneducated immigrant, in disparate financial situations. *Id.* at 62. After ten years of marriage and two children, the husband informed the wife that he would divorce her unless she agreed to certain terms regarding their economic relationship. *Id.* at 58 The wife's overriding concern was preserving her family—"she would [have] sign[ed] anything[.]" *Id.* (emphasis added).

> Thus, [the wife] faced a more difficult choice than the bride who is presented with a demand for a pre-nuptial agreement. The cost to [the wife] would have been the destruction of a family and the stigma of a failed marriage. She testified on several occasions that she signed the agreement to preserve the family and to make sure that her sons were raised in an intact family.

> [The wife's] access to eminent counsel is of little relevance because her decision was dictated not by a consideration of her legal rights, but by her desire to preserve the family.

*Id.* at 59. Based on these circumstances, the court found that the context in which the husband made his demand was "inherently coercive" because the wife's decision "was dictated not by a consideration of her legal rights, but by her desire to preserve the family." *Id.* Therefore, the *Pacelli* court looked to the totality of the circumstances in reaching its determination that the postmarital agreement was unenforceable. *Id.* at 63.

In *In re Marriage of Baltins*, 212 Cal. App.3d 66, 260 Cal.Rptr. 403 (Cal.Ct.App. 1989), a California appeals court examined the totality of the circumstances in finding that the husband intentionally used coercion to induce the wife's consent to an unconscionable contract. *Id.* at 87, 260 Cal.Rptr. 403. The court found that the wife was "effectively" deprived of independent counsel, in a distraught and weakened condition emotionally, and had no reasonable alternative. The husband had undermined the wife psychologically by repeatedly telling her she had not contributed as much as he did to the marriage and was not an equal partner; he had made threats and misrepresentations; and he pressured the wife into taking immediate action. *Id.* Therefore, the *Baltins* court looked at the totality of the circumstances to find the husband had intentionally used duress to induce the wife's consent to the agreements. *Id.*

Other states have used a series of factors to measure the enforceability of postmarital agreements. For instance, Kansas courts have looked to whether:

> (1) each party had an opportunity to obtain separate legal counsel of each party's own choosing; (2) there was fraud or coercion

---

invalidate an involuntariness defense. Ray never waived the issue of whether his assent was voluntary.

**16.** A "mid-marriage" agreement is the same as a "postmarital" agreement in the context of these cases as both occur after the date of marriage but prior to a final divorce.

in obtaining the agreement; (3) all material assets were fully disclosed by both parties before the agreement was executed; (4) each spouse knowingly and explicitly agreed in writing to waive the right to a judicial equitable division of assets and all marital rights in the event of a divorce; (5) the terms of the agreement were fair and reasonable at the time of execution; and (6) the terms of the agreement are not unconscionable at the time of dissolution. *In re Marriage Traster,* 48 Kan.App.2d 356, 291 P.3d 494, 507 (2012). *See also Ansin v. Craven–Ansin,* 457 Mass. 283, 929 N.E.2d 955, 963–64 (2010) (using the first five factors to measure enforceability but not unconscionability).

In the application of the totality of circumstances and factor-based analyses, courts are not arbitrarily limited to a single test when analyzing postmarital contracts for involuntariness, but look to all the relevant conditions in a given case. Similarly, under the *Chen/Prell* standard, involuntariness can be found by evaluating "any other circumstance indicating lack of free will or voluntariness." *Chen,* 127 Hawai'i at 357, 279 P.3d at 22; *Prell,* 114 Hawai'i at 298, 162 P.3d at 14. Therefore, a court's analysis of the enforceability of postmarital contracts should not be "unfairly limited" and should be "broad enough to examine other factors." *Maguire,* 79 Hawai'i at 117, 899 P.2d at 400.

In the present case, the other circumstances specified in the uncontested findings firmly support the determination that Ray's assent to the "agreements" was involuntary. Like *Pacelli,* Ray's motivation was not preserving financial assets, but at saving the emotional relationship at any cost. Further, both the *Pacelli* court and the family court found that the vulnerable spouse would have signed "anything." *See Pacelli,* 725 A.2d at 58. Similar to *Baltins,* Sandra pressured Ray into immediate action, and, as discussed, Ray believed he had no other choice. 212 Cal.App.3d at 87, 260 Cal.Rptr. 403. Ray was in a distraught and weakened emotional

state and did not have the opportunity to consult with independent counsel, again similar to the wife in *Baltins. Id.*

Additionally, at least three of the six *Traster* factors were also present. First, Ray did not obtain separate legal counsel before signing the "agreements." Second, Ray did not knowingly and explicitly agree in writing to waive the right to a judicial equitable division of material assets and all marital rights in the event of a divorce. Third, the terms of the agreement were not fair and reasonable at the time of execution.

Therefore, construing *Prell*'s "any other circumstances" element as not "unfairly limit[ing]" and broad enough to examine other factors, would result in the same conclusion as the family court: that the "agreements" were involuntary and thus unenforceable.

## 5. The record demonstrates Ray's assent was unduly influenced

Under *Chen* and *Prell,* an agreement may also be involuntary if it is the result of undue influence.[17] *Chen,* 127 Hawai'i at 357, 279 P.3d at 22; *Prell,* 114 Hawai'i at 298, 162 P.3d at 14. Undue influence is defined as the improper use of power or trust in a way that deprives a person of free will and substitutes another's objective. *Cvitanovich–Dubie v. Dubie,* 125 Hawai'i 128, 160, 254 P.3d 439, 471 (2011). It is

the <u>misuse of a position of confidence</u> or the <u>taking advantage of a person's weakness, infirmity or distress</u> to change improperly that person's actions or decisions. While it is impossible to define or describe with precision and exactness what is undue influence, it matters that the quality and the extent of the power of one mind over another must be to make it undue. Thus, false representations, or misrepresentations of law or fact, are not essential to a showing of undue influence, for a person's will may be overborne without false representation.

*Chen,* 127 Hawai'i at 357, 279 P.3d at 22. As the family court's finding of "duress and coercion" was an implicit finding of involuntariness, undue influence was encompassed within the court's findings.

---

**17.** The majority notes that the family court did not make an express finding of undue influence. Majority at 45, 332 P.3d at 647. However, undue influence is an enumerated "circumstance indicating lack of free will or involuntariness."

*Cvitanovich–Dubie,* 125 Hawai'i at 160–61, 254 P.3d at 471–72 (emphasis added) (citations, brackets and quotation marks omitted). Undue influence is "coercive in nature, persuasion which overcomes the will without convincing the judgment." *Odorizzi v. Bloomfield Sch. Dist.,* 246 Cal.App.2d 123, 130, 54 Cal.Rptr. 533 (1966) (cited approvingly in *Cvitanovich–Dubie,* 125 Hawai'i at 160–61, 254 P.3d at 471–72). Therefore, the critical elements of undue influence are (1) the abuse of a position of confidence or taking advantage of a person's weakness, in order to (2) improperly change that person's actions or decisions; actual fraud is not necessary. *Cvitanovich–Dubie,* 125 Hawai'i at 160–61, 254 P.3d at 471–72.

As a spouse, Sandra was in a position of confidence in regards to Ray and it was an abuse of that confidence to influence her spouse to sign over significant property in order to demonstrate his commitment to the marriage. Furthermore, Ray's actions were improperly changed by Sandra; that is, he would not have promised her half of his interest in the house, all of the vehicles and contents of the house, and $100,000 in lieu of court proceedings, except for Sandra having told Ray "if he were serious about being committed to the marriage, then they should 'write something up.'" None of the facts found by the family court suggest that Ray was convinced the "agreements" were in good judgment; rather, it is unchallenged that "[e]ach time, Ray believed he could salvage the marriage by signing these agreements. He would have signed anything to save their thirty year marriage." (Emphasis added). Thus, Ray would not have signed over his share of the home in the "agreements" and the additional monetary payments to Sandra if it had not been on Sandra's insistence that he do so in order to demonstrate his commitment to save the marriage.

There is substantial evidence that Sandra's actions took advantage of her position as Ray's wife of 30 years and Ray's troubled emotional state in order to induce Ray to sign the "agreements." There is no indication that Ray would have otherwise spontaneously gifted essentially 100% of the marital estate to Sandra. Therefore, Sandra unduly influenced Ray's assent to the "agreements", and Ray's assent to the "agreements" is indicative of a lack of free will or voluntariness. Thus, the family court's implicit conclusion that Ray's assent was involuntary should be affirmed.

## C. Measuring involuntariness through a fiduciary relationship between spouses

The confidential relationship between spouses should require contracts to be subjected to a fiduciary standard to protect spouses against self-dealing and overreaching by the more dominant spouse. "Unlike parties to a premarital agreement or a separation agreement, parties to a postmarital agreement have stated their intention to remain part of an existing marriage in which they already share a vested interest, personal intimacy, and mutual trust." *Traster,* 291 P.3d at 503. In *Traster,* the Kansas Court of Appeals explained that the "trusting and confidential nature of this existing relationship exposes the parties to a greater risk of unfair advantage in the bargaining process for two reasons":

> First, spouses who intend to stay married are unlikely to view the marital interest as distinct from their own interest. As a result, spouses to a postmarital agreement run the risk of putting the interests of the couple ahead of their own which, in turn, will make them less cautious than they would be if negotiating at arm's length with an ordinary contracting party. Second, spouses who intend to stay married run a greater risk of unfair advantage in the bargaining process because the spouse who has the stronger desire to preserve the marriage necessarily becomes more vulnerable to the financial demands of the other.

*Id.* at 503 (emphasis added) (citation omitted). Therefore, *Traster* recognized two concerns: (1) spouses who wish to stay married are likely to put the marriage ahead of their individual interest; and (2) such spouses may be exploited because their commitment to the marriage will lead them to make greater financial sacrifices to preserve the relationship. Because of these concerns, the volun-

tariness of postmarital agreements should be evaluated with closer scrutiny.

Sixteen states and Puerto Rico impose greater burdens on postnuptial agreements than they impose on prenuptial agreements. Sean Hannon Williams, *Postnuptial Agreements,* 2007 Wis. L. Rev. 827, 838 (2007). The state courts and legislatures that have imposed additional procedural and substantive burdens on postnuptial agreements recognize that postmarital agreements "increase the potential for fraud and deception, often leaving the spouse with less economic leverage (usually the wife) with no choice but to sign an agreement presented by the wealthier spouse (usually the husband)," as opposed to premarital agreements. *Id.* at 830 (parentheticals in original).

Other jurisdictions have required review under a fiduciary standard, based on the fact that spouses stand in a confidential relationship with each other, and postmarital agreements are "executed when the parties do not contemplate divorce and when they owe <u>absolute fidelity</u> to each other." *Ansin,* 929 N.E.2d at 968 (emphasis added). *See In re Estate of Wilber,* 165 N.H. 246, 75 A.3d 1096, 1101 (2013) ("spouses are traditionally regarded as fiduciaries of one another"); *Tremont v. Tremont,* 35 A.D.3d 1046, 827 N.Y.S.2d 309, 311 (2006) ("courts carefully scrutinize marital agreements based on the fiduciary relationship of the parties"); *Dawbarn v. Dawbarn,* 175 N.C.App. 712, 625 S.E.2d 186, 191 (2006) ("The relationship between a husband and wife creates a fiduciary duty."); *Marsh v. Marsh,* 949 S.W.2d 734, 739 n. 4 (Tex.App.1997) ("in post-marital agreements a fiduciary duty exists that is not present in premarital agreements between prospective spouses"); and *In re Marriage of Bonds,* 24 Cal.4th 1, 99 Cal.Rptr.2d 252, 5 P.3d 815, 831 (2000) ("persons, once they are married, are in a fiduciary relationship to one another").

A fiduciary duty between spouses means that agreements between them "must meet the high standards of fiduciary trust, which means that there must be full disclosure and fair dealing." Howard O. Hunter, *Modern Law of Contracts* § 2:24 (2014). Courts holding spouses to a fiduciary standard require "the highest degree of good faith, candor and sincerity in all matters bearing on the terms and execution of the proposed agreement, with fairness being the ultimate measure." *Wilber,* 75 A.3d at 1101 (emphasis omitted). "Because of the confidential relationship between a husband and a wife, courts have imposed the same duties of good faith and fair dealing on spouses as required of partners and other fiduciaries." *Daniel v. Daniel,* 779 S.W.2d 110, 115 (Tex.App.1989). "When an interspousal transaction advantages one spouse, the law ... presumes such transactions to have been induced by undue influence. Courts of equity view gifts and contracts which are made or take place between parties occupying confidential relations with a jealous eye." *In re Marriage of Haines,* 33 Cal.App.4th 277, 293–94, 39 Cal. Rptr.2d 673 (1995) (citations, brackets, ellipsis, and quotation marks removed). For example, based on concerns over the uneven power dynamics in a mid-marriage context, California appellate courts have instituted a presumption of duress when considering the enforceability of postmarital agreements. *Bonds,* 99 Cal.Rptr.2d 252, 5 P.3d at 831. "Whenever [married persons] enter into an agreement in which one party gains an advantage, the advantaged party bears the burden of demonstrating that the agreement was <u>not</u> obtained through undue influence." *Id.* (emphasis added).

In keeping with the twin concerns expressed by *Traster* that spouses who wish to stay married are likely to put the marriage ahead of their individual interest and that such spouses may be exploited, transactions between spouses should be subject to the general rules governing fiduciary relationships, which guide the actions of persons occupying confidential relations with each other. *See* Cal. Fam.Code § 721 (2002).[18]

---

**18.** The California code provide the following definition of a fiduciary relationship between spouses:

[I]n transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse,

This requirement would impose a duty of good faith and fair dealing on each spouse, such that neither could take an unfair advantage of the other. The confidential relationship and fiduciary relationship would be subject to the same rights and duties of nonmarital business partners.

I would hold that an agreement that was not in accordance with fiduciary standards should be presumptively involuntary and unenforceable, and such agreements would be enforceable only if the defending spouse could demonstrate that the agreements in question were executed under a fiduciary standard of good faith and fair dealing. Given Ray's extreme mental distress and vulnerable state of mind described by the uncontested findings of the family court and the financial advantage gained by Sandra, the record before this court is clear that the agreements between Sandra and Ray do not meet the highest fair dealing standard of fiduciary trust, and the agreements are therefore presumptively involuntary and unenforceable.

## D. The October 6 "agreement" and MOU are invalid and unenforceable for lack of consideration

As an alternative basis for affirming the judgment of the family court, I would examine the threshold issue of whether the October 6 Document and MOU were supported by consideration sufficient to form a contract. Ray raised the defense of lack of consideration as a defense at trial. The family court's declination to make a determination as to lack of consideration was plain error, under the standards adopted by this court. In civil cases, the plain error rule is only invoked when "justice so requires." We have taken three factors into account in deciding whether our discretionary power

to notice plain error ought to be exercised in civil cases: (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import.

*U.S. Bank Nat'l Ass'n v. Castro,* 131 Hawai'i 28, 42, 313 P.3d 717, 731 (2013) (emphases added) (quoting *Montalvo v. Lapez,* 77 Hawai'i 282, 290, 884 P.2d 345, 353 (1994)). Here, with respect to the first two factors, no additional facts must be considered to determine the issue and finding a lack of consideration will not affect the integrity of the family court's FOFs. As to the final factor, the adequacy of consideration in postmarital agreements is of great public import because upholding such contracts without true bargained-for exchange does not allow the family court to exercise its authority to effect "just and equitable" distributions of the marital estate. *See* HRS § 580–47 ("the [family] court may make any further orders as shall appear just and equitable ... finally dividing and distributing the estate of the parties"); *Gussin v. Gussin,* 73 Haw. 470, 478, 836 P.2d 484, 488–89 (1992) (noting the wide discretion conferred upon the family court by HRS § 580–47); *Lewis,* 69 Haw. at 500–01, 748 P.2d at 1366 (holding that premarital agreements are enforceable when they do not violate the principle of a "just and equitable" award under HRS § 580–47). Therefore, invoking plain error is appropriate in this case.

### 1. Consideration in postmarital contracts

All contracts made between spouses, not otherwise invalid because of any other law, are valid. HRS § 572–22 (1987). However, the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and consider-

---

and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners ... including, but not limited to, the following:
(1) Providing each spouse access at all times to any books kept regarding a transaction for the purposes of inspection and copying.
(2) Rendering upon request, true and full information of all things affecting any transac-

tion which concerns the community property. Nothing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions.
(3) Accounting to the spouse, and holding as a trustee, any benefit or profit derived from any transaction by one spouse without the consent of the other spouse which concerns the community property.
Cal. Fam.Code § 721 (2003).

ation. Restatement (Second) of Contracts § 17 (1981) (emphasis added). This court has stated that "[a] compromise, like any other contractual agreement, must be supported by consideration." *Sylvester v. Animal Emergency Clinic of Oahu,* 72 Haw. 560, 567, 825 P.2d 1053, 1057 (1992). Therefore, consideration is a threshold issue in determining whether a contract exists.

"It is well-settled that consideration is an essential element of, and is necessary to the enforceability or validity of, a contract." *Douglass v. Pflueger Haw., Inc.,* 110 Hawai'i 520, 534, 135 P.3d 129, 143 (2006) (quoting *Shanghai Inv. Co., Inc. v. Alteka Co., Ltd.,* 92 Hawai'i 482, 496, 993 P.2d 516, 530 (2000), *overruled on other grounds by Blair v. Ing,* 96 Hawai'i 327, 31 P.3d 184 (2001)). To constitute consideration, a performance or a return promise must be bargained for. Restatement (Second) of Contracts § 71 (1981). Consideration may take many forms; it is well established that "[f]orbearance to exercise a right is good consideration for a promise." *Shannon v. Waterhouse,* 58 Haw. 4, 7, 563 P.2d 391, 393 (1977).

Although the family court did not address the issue of the lack of consideration, the determination of lack of consideration is a question of law for the court to decide, reviewable de novo. *Stern v. Stern,* 430 Pa. 605, 243 A.2d 319, 320 (1968); *Colligan v. Smith,* 366 S.W.2d 816, 818 (Tex.Civ.App. 1963); *Farmers Union Oil Co. of New England v. Maixner,* 376 N.W.2d 43, 48 n. 2 (N.D.1985). This court has not examined what constitutes consideration for a postnuptial contract between spouses. Other courts have held that neither the marriage itself, nor continuation of the marriage, can act as sufficient consideration for a postnuptial agreement because past consideration cannot support a current promise. *See Bratton v. Bratton,* 136 S.W.3d 595, 600 (Tenn.2004); *Whitmore v. Whitmore,* 8 A.D.3d 371, 778 N.Y.S.2d 73, 75 (2004).[19]

In *Bratton,* a husband signed a letter in which he promised "never to be the cause of a divorce." *Bratton,* 136 S.W.3d at 597. In the event that he broke the promise, he promised to give to the wife "50% of my present belongings and 50% of my net future earnings." *Id.* The Supreme Court of Tennessee found that a promise to stay in a marriage is not consideration.

Ms. Bratton's promise not to leave her husband is clearly not consideration for the agreement. Both parties' admitted that they were not having marital difficulties at the time the agreement was signed. Therefore, this was not a reconciliation agreement where separation or divorce was imminent, making the wife's promise to remain in the marriage a meaningful act.

*Id.* at 603 (emphases added). Similarly, in *Whitmore,* 16 years before actually divorcing, the husband and wife executed a document entitled "Marital Agreement" in which the wife "waived her right to any business property owned by the husband, regardless whether it was acquired before or after the marriage." *Whitmore,* 778 N.Y.S.2d at 74. The court found that:

Here, the wife received no consideration for signing the postnuptial agreement. The postnuptial agreement does not recite any consideration, and does not contain any mutual promises. Although the wife released her claims on the husband's business property, he did not relinquish any rights to any of her property or give the wife anything in return. The husband claims that his continuing to remain married to the wife provided adequate consideration. We disagree.

*Id.* at 75 (emphases added). Therefore, when there is no actual intent or contemplation of divorce, postmarital contracts, in which one spouse promises to relinquish significant property rights in the event of divorce, and the other side only promises to remain in the marriage or to not get divorced, are void for lack of consideration.

## 2. The "agreements" lack consideration

Here, it is not clear as to what was the bargained-for exchange that would support

---

19. *But cf. Zagari v. Zagari,* 191 Misc.2d 733, 746 N.Y.S.2d 235, 238 (2002) (declining to find lack of consideration in a post marital agreement where the agreement recited consideration and the spouse seeking to invalidate the agreement offered no proof on the issue of consideration).

the existence of a contract in the first two agreements.[20] The October 6 Document provided that in the event of a separation, Ray would give up half of his interest in the couple's home worth approximately $1.6 million, plus the contents of the home (except his clothes and tools), plus any interest in the couple's vehicles. In the MOU, Ray additionally agreed to pay $100,000 in lieu of alimony and court proceedings. Therefore, Ray's promise in the first two "agreements" is clear; in the event of a divorce or separation, he would relinquish or pay significant property to Sandra.

However, it is not clear what constituted Sandra's return performance or promise. The documents themselves do not recite an exchange of promises. Intuitively, it would seem that Sandra's return "promise" was forbearance of her right to divorce Ray. However, divorce was not on Sandra's mind-it is the uncontested findings of the family court that "Sandra was not thinking about a divorce; she took Ray's signing [of the October 6 Document] as a show of his commitment"; "[t]he parties signed the MOU with the intent that they would work on the marriage"; "Sandra believed Ray signed the Quitclaim Deed because he was serious about saving the marriage." (Emphases added). The family court found "that the parties were motivated to save the marriage when they signed the various agreements .... Neither party intended their marriage to result in a divorce and to divide their marital estate accordingly." Even after overhearing Ray say "maybe divorce" to his sister, Sandra still "wanted Ray to work on the marriage[.]" As it is the uncontested findings of the family court that when Sandra signed the first two agreements she did not intend to divorce Ray, Sandra's return promise could not have been to forbear from acting on her legal right to divorce Ray.

At oral argument, counsel for Sandra characterized the consideration for the October 6 "agreement" as the exchange of mutual promises: "You promise to work hard on the marriage, and I promise to work hard on the marriage, and if this thing doesn't work, this promise for promise, then this is how we're going to divide our assets."[21] When pressed on the issue of consideration for the subsequent agreements, counsel conceded, "We really didn't delve into what the consideration was ... We really didn't delve into that."[22] Moreover, a promise to work hard or stay in the marriage would not serve as consideration under *Whitmore* or *Bratton*. *Whitmore*, 778 N.Y.S.2d at 75; *Bratton*, 136 S.W.3d at 600, 603. Sandra and Ray were already in a legal union, therefore, a promise by either to remain in the relationship would not constitute a new promise.

Such promises by Sandra would also be illusory. An illusory promise is not consideration.

> A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances unless
>
> (a) each of the alternative performances would have been consideration if it alone had been bargained for; or
>
> (b) one of the alternative performances would have been consideration and there is or appears to the parties to be a substantial possibility that before the promisor exercises his choice events may eliminate the alternatives which would not have been consideration.

Restatement (Second) of Contracts § 77 (1981). That is, promises which allow the promisor to choose from a range of alternative return performances, at least some of which would not constitute consideration, cannot constitute consideration.

> Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise. In such cases there might theoretically be a bargain to pay for the utterance of the words, but in practice it is performance which is bargained for. Where the appar-

---

**20.** The Quitclaim Deed contained its own recitation of consideration.

**21.** MP3: Oral Argument, Hawaiʻi Supreme Court, at 31:40 (Mar. 4, 2013), http://www. courts.state.hi.us/courts/oral_arguments/archive/oasc_11_1074.html.

**22.** *Id.* at 33:10.

ent assurance of performance is illusory, it is not consideration for a return promise. *Id.* at cmt. a (citation omitted). Consequently, a return performance that is fully optional cannot constitute consideration. Therefore, a promise of return performance that allows for alternative performances that include not performing, cannot constitute consideration.

Here, the promise, "I promise to work hard in the marriage," would be illusory because Sandra reserved a right to alternative performances—i.e., divorce or separation—which would not constitute consideration. Further, Sandra's performance of the "promise" was entirely optional; that is, there was no consequence or detriment to Sandra for a decision to "breach" the contract by not working hard in the marriage.

Sandra did not make a valid return promise in exchange for Ray's promise to relinquish marital property or make certain payments in the October 6 Document and the MOU. Therefore, the October 6 "agreement" and MOU are voidable by Ray for lack of consideration.

### III. Conclusion

The facts demonstrate that all of the "agreements" are unenforceable. First, the family court correctly found that the Quitclaim Deed was unenforceable as unconscionable. Second, the family court implicitly found that Ray's assent to all of the agreements was involuntary. As involuntariness is a question of fact, the family court may be overturned only if its findings of fact are clearly erroneous. Here, the family court's findings are not clearly erroneous because there is substantial evidence supporting a finding of involuntariness as there is both ample evidence of other circumstances demonstrating involuntariness and the record supports a finding of undue influence. Moreover, this court should require closer scrutiny of postmarital contracts, by holding that spouses are fiduciaries of the other. Finally, the October 6 Document and the MOU are invalid and unenforceable for lack of consideration. Instead of protecting vulnerable parties to a postmarital agreement, the majority's holding allows an overreaching spouse seeking to circumvent equitable dis-

tribution of marital assets to take financial advantage of a committed partner who is desperately trying to save the marriage.